HARRY FEATHERSTONE

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

194    325
196   ³177
194    325
212   ³242

*Opinion filed December 18, 1901—Rehearing denied February 20, 1902.*

1. CRIMINAL LAW—*parole laws are not intended to fix punishment for crimes.* The parole laws are not intended to fix the punishment for crime, but to direct the manner of the imposing of sentence by the court.

2. SAME—*punishment is synonymous with penalty.* In connection with crimes of the highest grade punishment is synonymous with penalty, such punishment being fixed by the law defining the crime, whereas the sentence is the final determination of the court.

3. SAME—*Habitual Criminal act of 1883 has not been repealed.* The Habitual Criminal act of 1883 has not been repealed by the enactment of the various parole acts of 1895, 1897 and 1899, but remains in force, and persons convicted thereunder may, since the enactment of the Parole law of 1899, receive the benefit of such law and be required to serve not less than one year nor more than the term fixed by the Habitual Criminal act.

4. SAME—*proof of averment of former conviction may be given in chief.* Where an indictment contains an averment of former conviction, as is authorized by the Habitual Criminal act of 1883, the proof of such averment is a part of the case in chief for the People.

5. SAME—*considerable latitude must be allowed the court in a criminal case.* Considerable latitude must be allowed the trial judge during the progress of a criminal case, that he may ask questions of witnesses or call upon counsel for statements of what has preceded, thus enabling him to give proper rulings.

6. SAME—*trial judge should avoid expressions of opinion before the jury.* In the conduct of a criminal case the trial judge should use great care to avoid expressions of opinion before the jury which might give the impression that he was more favorably inclined to one side than the other or that he placed greater credence upon the testimony of certain witnesses than of others; but unless his duty in that respect has been manifestly disregarded, a court of review will not hold his conduct to be reversible error.

7. SAME—*when improper remark will not reverse.* If the evidence on the question of *alibi* is conflicting, it is improper for the court to remark, after the testimony of one of the defendant's witnesses, that "somebody is lying about this;" but such remark will not be ground for reversal, if, upon the whole record, the court of review entertains no doubt as to the defendant's guilt.

8. SAME—*test of a witness' qualification is not age, but understanding.* That a boy six years old was allowed to testify in a criminal case is not error if his preliminary examination shows that he understood the nature and meaning of an oath, but it is for the jury to say what weight shall be given to his testimony.

9. SAME—*that some instructions are printed in large type is not ground, for reversal.* It is not ground for reversal that some of the instructions for the People were uniformly printed in unusually large type.

10. SAME—*a verdict need not fix or name the place of imprisonment.* A verdict finding the accused guilty of robbery, as charged in the indictment, and that he had been previously convicted of burglary and served a term in the penitentiary, is not defective because it fails to fix or name the place where he should be imprisoned.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. O. H. HORTON, Judge, presiding.

FRANK H. BOWEN, (KICKHAM SCANLAN, of counsel,) for plaintiff in error:

The motion to quash the habitual count in the indictment should have been sustained. The Habitual act of 1883 has been repealed by the amendment of 1897 to the Parole act of 1895, which act, as amended, was itself repealed by the Parole act of 1899. Laws of 1883, p. 76; Laws of 1899, secs. 1-12, p. 142; *Mullen* v. *People*, 31 Ill.

444; *Dingman* v. *People*, 51 id. 277; *Goodall* v. *People*, 123 id. 389; *Kelly* v. *People*, id. 367.

It was error for the State's attorney, during the taking of the testimony for the People and before the defense had been called upon to produce any evidence, to offer in evidence the record of the previous conviction of defendant. *Mullen* v. *People*, 31 Ill. 444; *Dingman* v. *People*, 51 id. 277; *Kelly* v. *People*, 123 id. 367; *Goodall* v. *People*, id. 389.

It was error for the court to cross-examine witnesses in a manner showing prejudice and bias. *Dunn* v. *People*, 172 Ill. 582; *Synon* v. *People*, 188 id. 609.

The various remarks of the court as to the credibility and weight of the evidence were highly prejudicial to defendant, and are reversible error. *Dunn* v. *People*, 172 Ill. 582; *Marzen* v. *People*, 173 id. 43; *Feinberg* v. *People*, 174 id. 609; *Bill* v. *People*, 14 id. 432; *Kennedy* v. *People*, 44 id. 283.

The court erred in giving all the instructions for the prosecution in large printed type when those for the defendant were given in ordinary typewriting. This point is particularly urged as to the first instruction given for the prosecution and specially referring to the defendant. *Hagenow* v. *People*, 188 Ill. 545.

The verdict is fatally defective in failing to recite the punishment and the place of punishment of defendant.

H. J. HAMLIN, Attorney General, CHARLES S. DENEEN, State's Attorney, and JOHN S. LEE, for the People:

Repeals by implication are never favored, and the earliest statute will be continued in force unless the two are clearly inconsistent with or repugnant to each other. *Bruce* v. *Schuyler*, 4 Gilm. 221; *People* v. *Harrison*, 185 Ill. 307; *Hume* v. *Gossett*, 43 id. 297; *Cook* v. *Gilbert*, 146 id. 268; *People* v. *Barr*, 44 id. 198; *Rich* v. *Chicago*, 152 id. 20; *People* v. *Raymond*, 186 id. 407.

A general enactment does not operate as a repeal of a special law on the same subject. So a subsequent statute which is general in its nature does not abrogate a

former statute which is particular. *Braceville* v. *Doherty,* 30 Ill. App. 645; *Kelly* v. *School Directors,* 66 id. 134; *Ottawa* v. *LaSalle County,* 12 Ill. 339; *Litchfield Coal Co.* v. *Taylor,* 81 id. 590; *Butz* v. *Kerr,* 123 id. 659; *People* v. *Harrison,* 185 id. 307; *Ridgway* v. *Gallatin County,* 181 id. 521.

A statute or amendment which enlarges the class of cases made punishable by a former statute but leaves the punishment the same, does not operate as a repeal of the former statute. *People* v. *Safford,* 5 Denio, 112; *Commonwealth* v. *Herrick,* 6 Cush. 465; *State* v. *Herzog,* 25 Minn. 490; *Moore* v. *Mousert,* 49 N. Y. 332.

When a defendant takes the stand a record of his former conviction becomes competent to affect his credibility as a witness. *Simons* v. *People,* 150 Ill. 66; *Kirby* v. *People,* 123 id. 438; *Bartholomew* v. *People,* 104 id. 608.

Evidence when admissible for any purpose should be admitted, and if improper for any other purpose its effect should be controlled by instructions offered by the party objecting thereto. *Railroad Co.* v. *Bailey,* 145 Ill. 159; *Railroad Co.* v. *Clark,* 108 id. 113; *Jamison* v. *People,* 145 id. 359; *Ruggles* v. *Gatton,* 50 id. 412.

Where the result reached by the judgment is clearly right, it should never be reversed for errors not affecting the substantial merits of the case. *Wilson* v. *People,* 94 Ill. 299; *Ritzman* v. *People,* 110 id. 362; *Zimm* v. *People,* 111 id. 49; *Burke* v. *People,* 148 id. 70; *Gore* v. *People,* 162 id. 259.

If an infant appears to have sufficient natural intelligence and to have been so instructed as to comprehend the nature and effect of an oath, he may, in the discretion of the court, be admitted to testify, whatever his age may be. 1 Greenleaf on Evidence, (16th ed.) par. 367; *Epstein* v. *Berkowsky,* 64 Ill. App. 498.

Where the court can see from the record that the evidence is so overwhelmingly against the defendant that had a jury been instructed correctly they must still have found as they did, it will not reverse for error in instructions. *Hoge* v. *People,* 170 Ill. 35; *Bressler* v. *People,* 117 id. 422.

Mr. JUSTICE RICKS delivered the opinion of the court:

At the September term of the criminal court of Cook county the plaintiff in error was indicted for the robbery of one Randolph Graden. The indictment contains two counts, the first count being an ordinary count under the statute, charging plaintiff in error, William Law and one Davis, jointly, with robbery, and the second count being formed under the Habitual Criminal act of 1883, charging that the plaintiff in error, at the January term, 1891, of said court, was indicted for the robbery of one Frank Lynn and taking from him the money of Swan & Wilder, bankers, and also for the burglary of the bank of Swan & Wilder, and by proper averments shows his trial, conviction and sentence on plea of guilty to the charge of burglary before that indictment, and concludes with the charge that after said conviction and sentence plaintiff in error was guilty of the robbery of Randolph Graden. At the April term, 1901, of said court the plaintiff made a motion to quash the second count, being the habitual count of the indictment, which the court overruled. Trial was had at that term before a jury, who returned a verdict finding the defendant guilty in the manner and form as charged in the indictment, and further finding that the defendant had theretofore been convicted of burglary, and had served a term in the penitentiary at Joliet by virtue of said conviction. Plaintiff brings the case to this court on error, and assigns upon the record fourteen grounds, upon eight of which he insists.

The first ground relied upon is, that the motion to quash the habitual count in the indictment should have been sustained, and the second, that it was error in the trial court to allow the State to offer the record of the former conviction as part of its evidence in chief. The first and second grounds are so related to each other that they will be considered together.

It is first insisted that the Habitual Criminal act of 1883 has been repealed by what is commonly known as

the Parole act of 1897, and that, that act having been repealed, so much of the indictment as counted upon it was bad, and that it was consequently improper to have allowed evidence in chief of the former conviction. In 1883 what was generally called the Habitual Criminal act, but which was entitled "An act in relation to the punishment of criminals," (Laws of 1883, p. 76,) was passed. That act, after the enacting clause, is as follows:

"That whenever any person having been convicted of either of the crimes of burglary, grand larceny, horse-stealing, robbery, forgery, or counterfeiting, shall thereafter be convicted of any one of such crimes, committed after such first conviction, the punishment shall be imprisonment in the penitentiary for the full term provided by law for such crime at the time of such last conviction therefor; and whenever any such person, having been so convicted the second time as above provided, shall be again convicted of any .of said crimes, committed after said second conviction, the punishment shall be imprisonment in the penitentiary for a period not less than fifteen years: *Provided*, that such former conviction or convictions, and judgment or judgments, shall be set forth in apt words in the indictment.

"Sec. 2. On any trial for any of said offenses, a duly authenticated copy of the record of a former conviction and judgment of any court of record, for either of said crimes against the party indicted, shall be *prima facie* evidence of such former conviction, and may be used in evidence against such party."

Afterwards, in 1895, the legislature enacted what is known as the first Parole law, under the title of "An act in relation to the sentence of persons convicted of crime and providing for a system of parole." (Laws of 1895, p. 158.) The first section of that act is as follows: "That every person over twenty-one years of age, who shall be convicted of a felony or other crime punishable by imprisonment in the penitentiary, excepting treason and

murder, shall be sentenced to the penitentiary, but the court imposing such sentence shall not fix the limit or duration of the sentence, and the term of imprisonment of any person so convicted and sentenced shall not exceed the maximum term nor be less than the minimum term provided by law for the crime for which the person was convicted and sentenced, making allowance for good time as now provided by law. The release of such prisoner to be determined as hereinafter provided."

In 1897, section 1 of the act of 1895 was amended in some respects not material to the consideration of this case, and a new section was added, which by the act itself was designated as and to be inserted in the act of 1895 as section 9 of said act, as follows: "The provisions of this act shall not apply, so far as they concern his parole, to any person over twenty-one years of age convicted and sentenced to a penitentiary in this State who may be shown, upon his trial, to have been previously sentenced to a penitentiary in this or any other State or country, but such person shall be held and considered as an habitual criminal and shall be required to serve the maximum sentence provided by law for the crime of which he has been convicted, less the good time which he may earn by good conduct, as now provided by law. Also that section 9 of said act, as it now stands, be hereafter known as section 10." (Laws of 1897, p. 203.)

In 1899 an entire new act was passed in relation to the parole system, under the title of "An act to revise the law in relation to the sentence and commitment of prisoners convicted of crime, and providing for a system of parole, and to provide compensation for the officers of said system of parole." (Laws of 1899, p. 142.) The first section of that act is as follows: "That every male person over twenty-one years of age, and every female person over eighteen years of age, who shall be convicted of a felony or other crime punishable by imprisonment in the penitentiary, except treason and murder, shall be sen-

tenced to the penitentiary, and the court imposing such sentence shall not fix the limit or duration of the same, but the term of such imprisonment shall not be less than one year, nor shall it exceed the maximum term provided by law for the crime of which the prisoner was convicted, making allowance for good time, as now provided by law." This last act by express provision repealed the acts of 1895 and the amendment made thereto by the act of 1897. The act of 1895 contains a repealing clause repealing all acts in conflict with its provisions. The act of 1897, being the amendatory act above mentioned, contained no repealing clause. The first question then is, what effect did the passage of these several acts relating to the parole system have, if any, upon the act of 1883 affecting habitual criminals?

It will be observed that in neither of the acts under the parole system is it attempted to fix a punishment for any offense, but the act professes by its title to be in relation to the *sentencing* of persons convicted of crime. In the first section of the act of 1895 we find this language: "The term of imprisonment of any person so convicted and sentenced shall not exceed the maximum term nor be less than the minimum term provided by law for the crime for which the person was convicted," etc. In the amendment of that section of 1897 we find the following expression: "The term of imprisonment of any person so convicted and sentenced shall not exceed the maximum term provided by law for the crime," etc. In these two expressions there is a slight difference, the difference being, that in the act of 1895 the provision is that the term of imprisonment shall not be less than the minimum term provided by law, which is not contained in the amendment of 1897. But in section 1 of the act of 1899 we find this language: "But the term of such imprisonment shall not be less than one year, nor shall it exceed the maximum term provided by law for the crime of which the prisoner was convicted," etc.

It is, it seems to us, apparent from the reading of this section 1 as enacted and amended by the various acts referred to, that these parole acts were not intended to fix the *punishment* for crime as that term is commonly understood, but seem to direct the manner of imposing the *sentence* by the court, because in section 1 above quoted in each of the acts; the reference is to the punishment or *term provided by law*, clearly implying that the legislature had already defined crimes and fixed their punishment, and that that punishment might be changed by the legislature after the passage of the parole acts without in any manner affecting the operation of such acts. These parole acts only related to that class of offenses punishable by imprisonment in the penitentiary, and the design of them was to give the prison board, and later the board of pardons, such control over the person of the convict, when committed to the prison, that the severity of punishment provided by law might, by proper conduct and such other circumstances as should appeal to the judgment and conscience of those boards, be ameliorated.

The law of 1883 is but an enlargement of a law that has been on our statute books since 1867, which latter law is section 169 of the Criminal Code. (Hurd's Stat. 1899, chap. 38.) This latter act relates wholly to petit larceny, the punishment for which, as provided by section 168 of the same code, is a fine and imprisonment in the county jail or work upon the streets, etc. By this section 169 it is provided that upon the second conviction for the offense of petit larceny, if the first conviction shall be set forth in apt words in the indictment, the punishment shall be by imprisonment in the penitentiary for a term not exceeding three years. Here the punishment for the second offense is provided by law, and one convicted for the second offense of petit larceny under that act would, by virtue of the parole act of 1899, be sentenced by the court to the penitentiary simply, but section 1 of the act would require that he serve not less

than one nor more than three years,—the maximum term for such offense provided by law.

Punishment is synonymous with penalty. (*Beggs* v. *State*, 122 Ind. 54.) "Penalty," "liability" and "forfeiture" are synonymous with "punishment" in connection with crimes of the highest grade. (*United States* v. *Reisinger*, 128 U. S. 398.) The punishment or penalty is fixed by the law defining and inhibiting the criminal act; the *sentence* is the final determination of the criminal court,—the pronouncement by the judge of the penalty or punishment as the consequence to the defendant of the fact of his guilt. (21 Am. & Eng. Ency. of Law,—1st ed.—p. 1066.) The act of 1883 provides the punishment or penalty and the parole acts relate to the manner in which that penalty or punishment shall be pronounced by the court and treated by the pardoning board.

But plaintiff in error insists that the new section 9 enacted as a part of the act of 1897, *supra*, covered the same subject matter and related to the same thing, and by implication repealed the act of 1883, and that the act of 1899 having in express terms repealed the act of 1897, thereby all laws relating to habitual criminals were effaced from our statute books. We do not think so. The act of 1883 only affected the perpetrators of six specified forms of crime,—*i. e.*, burglary, grand larceny, horse-stealing, robbery, forgery and counterfeiting. The new section 9 of the act of 1897, which by express terms was engrafted on to the whole body of the act establishing the parole system, merely created an exception from the provisions of the latter act against all persons who had previously been convicted and *sentenced to the penitentiary* in this State or in any other State or country, without regard to the name or character of the offense, so that such persons would not have the benefit of the Parole act, but would be required to serve the full term provided by law.

Such being our construction of this provision of the statutes above referred to, we are unable to yield to the

contention of the plaintiff in error that the provisions
of the act for the parole system repealed the act of 1883
fixing the punishment for the offenses therein named or
the method of pleading therein described, but that the
act of 1883 stands, and persons convicted under it would
receive the benefit of the parole system and be required to
serve not less than one year and not more than the term
fixed by the act of 1883. Holding, as we do, that the act
of 1883 was in force, it follows that the court did not err
in admitting the record in evidence in the first instance,
on behalf of the People, showing the former conviction
of plaintiff in error. Nor did the court err in refusing to
quash the second count of the indictment. The indict-
ment charged the former conviction, and the proof of that
averment was a part of the case in chief for the People.

The plaintiff in error insists that the trial court erred
in making improper remarks to the jury, and to the coun-
sel for the defendant below, in the presence of the jury;
also, that the court erred in cross-examining the defend-
ant and his witnesses, and in exhibiting a hostile feeling
towards the defendant, his witnesses and his counsel.

In the examination the counsel for plaintiff below
asked of a police officer testifying if he had ever shown
any other man than these defendants to the prosecuting
witness, to be identified. The counsel for defendants ob-
jected, whereupon the trial court remarked, "If there is
any question arises as to the truth of the testimony of
Graden, and it is left in doubt, I will allow you to call
him again." The reason then given by counsel for plain-
tiff below why the question should be asked was ap-
parently deemed by the court to be insufficient, and the
objection to the question by defendant's counsel was
sustained.

When a small boy, six years of age, (a witness for the
prosecution,) had been partly examined, the defendant
objected to the competency of the witness and asked the
court to interrogate him as to his knowledge of right and

wrong. After a few questions were asked the court remarked, "He seems to have a remarkably clear idea as to right and wrong for a boy of his age." Questions were further asked, and the court said, "This is an intelligent little boy." Further on the little boy said his sister had told him to have manners, and the court remarked, "I guess she is a good sister, too." The child continued: "She didn't tell me to tell the truth; told me not to tell anything that I did not see." Here the court said, "I guess he has been instructed right, too." To all these remarks exceptions were taken. The court permitted the boy to testify, to which the defendant objected. The court then said: "I think I will let him testify, with proper instruction to the jury with regard to the little fellow. What weight they shall give his testimony will be a question for the jury." Counsel for defendant: "That will be under my objection." The court: "You can present any instructions you want to on the subject and I will instruct as it seems to me to be right." No instruction, however, was asked by counsel for defendant below.

The testimony of the witnesses for the prosecution showed that the robbery took place about seven o'clock A. M. The robbery was reported and officers started after the culprits about 8:05 A. M., the arrest being made some time about 8:30 A. M. It was between 9:30 A. M. and 9:40 A. M. when the officers arrived at the station with their prisoners. A book in which a record of prisoners brought to the station was kept showed 9:50 A. M. as the time of the entry of the defendant. To prove an *alibi* a witness for defendant swore that she was called to the home of Mrs. Featherstone on the day of the robbery, on account of sickness, at about three o'clock A. M., and that she saw the defendant at different times until nine o'clock A. M., when he bid his mother good-by and left. Another witness testified that she saw the defendant eating his breakfast at about eight o'clock that morning. At this juncture the court said, "Somebody is lying about this."

During the examination of defendant his counsel asked him questions, which he was answering by "Yes, sir," and "No, sir," and the court said, "Let the witness testify a little." Later on he said again: "Let the witness testify a little. You have testified all the time. That's the form of your questions; now let him testify." Counsel for the State had entered no objections. At another time, when the record of arrests was offered, under objection, the court said: "I will take the responsibility; I sent for this book and I will take the responsibility."

It appeared that the defendant's sister had taken the stand as Emma Louisa Featherstone, stenographer at Sears, Roebuck & Co. She was there registered as Emma Featherstone-Hall. In proving that they were one and the same person the court remarked, "It doesn't make any difference, but I don't want any mistake in the question of identity for the other courts." Upon the introduction of the register it showed that Miss Featherstone-Hall, who claims she took her vacation during the week beginning August 27, had worked all that week except August 28,—the day of the robbery. Miss Featherstone-Hall requested the time-keeper to tell any one who might ask if she worked that week that she took her vacation at that time. The book showed that some one had tampered with it, but it was not shown who had done so. The trial judge, after scrutinizing it, said: "Let the witness stand there a moment. I would like to have a glass. There is a matter on this page that I would like to see about." This was a witness for the State. She was recalled, and testified that there was an apparent erasure in the book and that she probably made it herself; that she sometimes made mistakes, and erasures to correct the mistakes.

The court also asked questions during the cross-examination of one Mrs. McKenna, a witness for defendant, to which defendant's counsel took no exception, nor has he seen fit to set them out in his abstract of the record.

To us they seem fair and unprejudiced, and we do not deem it necessary to consider them further.

It frequently happens that the court can foresee questions arising as to the admissibility of evidence that make it necessary and proper for him to ask questions of witnesses, that he may more fully inform himself as to the situation and the questions that are likely to arise. Necessarily, a considerable latitude must be allowed the trial court in the progress of a criminal cause, that he may ask questions of the witnesses or call upon counsel for statements of what has preceded, and possess himself of such knowledge as will enable him to give proper rulings. (*Burke* v. *People*, 148 Ill. 70.) In doing so he should exercise great care to avoid giving expression to any thoughts that would be calculated to lead the jury to believe that his opinion was favorable to or against the case of the defendant, and also to avoid giving to the jury the impression that in his judgment greater credence should be given to one witness more than another, or to the witnesses of one side of the cause more than the other; and unless his duty in that respect has manifestly been disregarded by him, a court of review is not warranted in saying that his conduct is reversible error. In the matters complained of, touching his examination of these witnesses and the remarks attributed to the court, we are constrained to say that some of them were incautious and cannot receive our approval. The only remark that we feel especially called upon to criticise is that made during the examination of Mrs. Taylor, the second witness for the defendant. The defendant was attempting to prove an *alibi*. The evidence for the People tended to show that the alleged offense was committed between seven and eight o'clock. This witness stated that she was at the house of defendant's mother and saw him eating breakfast as late as eight o'clock, and that he was about the house a short time after that. At the close of her evidence the court remarked, "Somebody is lying

about this." We are not unmindful of the fact that this evidence discloses a very sharp conflict, and that it was apparent to any listener, and no less so to the court, that it was not possible to reconcile this testimony with that given by the witnesses for the People; yet, however much the court may have felt the force of such situation, he was certainly not warranted in making such a declaration. We are not, however, able to say the conclusion necessarily or reasonably follows that the jury did or could infer from this remark that the expression of the court indicated his belief that the witness just leaving the stand was the one to whom that charge could be laid.

If, upon the whole record, we entertained any doubt of the guilt of the plaintiff in error, arising from the closeness of the facts, we would deem it incumbent upon us to reverse this case. The testimony of the witnesses for the People shows that the offense was committed between seven and eight o'clock in the morning, in August, in broad daylight, in one of the public streets of Chicago. As the records show, the prosecuting witness, Randolph Graden, by a trick familiar in criminal annals, was induced by a confederate of plaintiff in error, one Davis, to start with him toward the lake to view a supposed wreck of a railroad train; that on the way they came upon Law, another confederate, who had an outfit for working the shell-game, which he operated by placing a piece of card-board on his arm and raising his arm against his body and using it as for a table and there using the three half-shells of English walnuts. Of this confederate Davis made some inquiry about the wreck and was advised by Law that the coroner had not come yet. Davis then became engaged in playing this game with Law, and the prosecuting witness was induced to become interested in it to the extent that he drew his money, $50, out of his pocket, which was immediately grabbed by Davis and turned over to Law. Graden then grabbed both Law and Davis and attempted to get his money,

and plaintiff in error rushed up from behind, took hold of Graden, and, whirling him about, faced him, opened his coat and displayed a star with the words "City Police" on it, drew a revolver, charged Graden with gambling, declared him under arrest and stated he was going to take him to headquarters. Graden said, "If you are an officer stop these men who took my money." Plaintiff in error replied, "I don't want those men—I want you at headquarters." Graden expressed a desire to go to headquarters at once, when plaintiff in error drew the revolver on him and told him that if he caught him about there again he would kill him. During this controversy between plaintiff in error and Graden, Law and Davis ran away with the money, and as soon as plaintiff in error could get far enough away from Graden he, too, ran, following Davis and Law. Graden went to police headquarters and gave a description of the parties, and in a short while two officers found Law and plaintiff in error together and arrested them. On their way to the police station, Officer Qualey, who had plaintiff in error, saw him take a book out of his pocket and throw it down, and the other officer, who had Law, saw him take three shells out of his pocket and throw them away. As soon as they could get their prisoners to the station they returned to where the articles had been thrown, and the officer who had arrested Law found the shells that he had seen him throw there, but before Officer Qualey had gotten to the place where plaintiff in error had thrown the book, Tommy Garrity, a little boy six years old, saw the book on the adjoining lot to his home, picked it up and found between the leaves a police star such as the plaintiff in error wore, gave them to his father, and his father took them and turned them over to the police. Officer Qualey also testified that on the way to the police station plaintiff in error tried to buy him off and wanted to "fix things" with him. At the time of the arrest of plaintiff in error an old revolver was found on his person.

Graden positively identified both of these persons as two of those engaged in his robbery,—Law as the one who worked the shell-game and plaintiff in error as the one who had the revolver and star, and also identified the revolver and the star.   The evidence disclosed that the star was different from that worn by the police officers in Chicago and also in the inscription, and the revolver unusual in make and appearance.

Graden was an intelligent man; lived near Detroit, Michigan; had shipped stock to Chicago; had been supervisor, deputy sheriff and filled other official positions, and we feel entirely satisfied from the reading of this evidence that there is no mistake about this plaintiff in error being one of the guilty parties.   He was an ex-convict, and all the witnesses that testified for him, but two, were members of his family.   With the clear and explicit identification of plaintiff in error by the prosecuting witness, and the attendant and surrounding circumstances that were so corroborative of his statements, we feel that, however we may animadvert the remarks of the court, we would not be warranted in setting this verdict aside because of them.  *Burke* v. *People*, 148 Ill. 70; *Skelly* v. *Boland*, 78 id. 438.

Plaintiff in error further insists that the court erred in letting Tommy Garrity testify, because of his youth and lack of knowledge of the meaning of an oath.   The requirement is not one of age, but of understanding, and from a review of the preliminary examination of this witness and his testimony to the jury we are satisfied that the court did not err in permitting him to testify.   The court very properly said, speaking of the jury, "What weight they shall give his testimony will be a question for the jury."  *Epstein* v. *Berkowsky*, 64 Ill. App. 498; *Moffett* v. *South Park Comrs.* 138 Ill. 620; 1 Greenleaf on Evidence,—16th ed.—sec. 367.

During the progress of the trial the State offered the record of the former conviction of plaintiff in error for

the crime of burglary, under the averments of the indictment. Counsel for plaintiff in error objected to this evidence, and the court, in ruling on it, said: "The record will be inadmissible until the defendant takes the stand, as affecting his credibility as a witness. The record could be introduced to show that he had been convicted." The court's attention was then called to the fact of the averment in the indictment, and the record was admitted. We do not think the remark subject to the criticism made of it, taking the circumstances under which it was made into consideration. It was necessary for the court to make a ruling, and, probably not being advised of the averments of the indictment, announced the rule he did. It may have been possible to have simply sustained the objection, but we cannot say the court, by making a proper ruling upon the evidence with no more extended remark than is shown by this record, could come within the purview of the inhibition of the Criminal Code upon that subject. This question most frequently arises by counsel for the State taking unusual and unlicensed latitude in his arguments to the jury; but such a bare reference as this was, by a court in a formal ruling, should not, we think, submit the court to the criticism contended for.

The instruction with reference to the right of the defendant in a criminal case to testify and the effect of his testimony, and also the one defining robbery and the one explaining the legal presumption of innocence,—all of which may be termed stock instructions upon bare propositions of law,—were printed in unusually large type. No one word was made more prominent than another, the same kind of type being used throughout the instructions, and plaintiff in error does not complain that the law is not correctly stated, but insists that this was giving such undue emphasis to the instructions for the People that it was calculated to leave the jury with the impression that because large type was used the law

announced by it was better and stronger than the law announced by those contained in ordinary type. These instructions were evidently printed in great numbers for use in the State's attorney's office, and used in all criminal cases where they would apply. We do not think they are as much subject to criticism as the instructions in *Hagenow* v. *People*, 188 Ill. 545, where certain parts of the instruction were made more prominent by heavy type than others. Counsel for plaintiff in error refers to them as instructions in "scarefaced" type, and says they were the last straw that broke the camel's back. Whatever the effect of the instructions may have been, we are not willing to concede that it was due to the type in which they were printed.

The last contention of plaintiff in error is that the verdict was defective, in that it failed to fix or name the place in which plaintiff in error should be imprisoned. The verdict was as follows: "We, the jury, find, from the evidence, that the defendant, Harry Featherstone, is guilty of robbery in manner and form as charged in the indictment; and we further find, from the evidence, that Harry Featherstone, under the name of Harry Featherstone, has been heretofore convicted of burglary and has served in the Illinois State penitentiary at Joliet under and by virtue of said conviction." The contention is that it should have concluded with the expression, "and we fix his punishment at imprisonment in the penitentiary." The law determines where he shall be imprisoned, and since the adoption of the parole system the jury no longer fix the term, and, unless it be in some of the cases excepted from the provisions of the Parole act, we can see no reason for requiring such a direction from the jury to the court touching its duties in passing sentence. *Henderson* v. *People*, 165 Ill. 607.

The judgment of the criminal court of Cook county is affirmed.

*Judgment affirmed.*