(No. 14136.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ROBERT McMULLEN, Plaintiff in Error.

*Opinion filed December 22, 1921.*

1. CRIMINAL LAW—*trial judge should exercise care to avoid influencing jury.* While considerable latitude must be allowed in asking questions to enable the trial judge to give a proper ruling, the judge should exercise great care to avoid giving expression to any thought that may be calculated to lead the jury to infer that his opinion is in favor of or against the defendant in a criminal case.

2. SAME—*when limitation of argument of defendant's counsel is unreasonable.* A defendant in a criminal case has a right to have his counsel given a reasonable opportunity, in argument, to discuss before the jury both the facts and the law of the case, and where evidence on a trial for robbery with a deadly weapon is voluminous and the conviction rests largely upon the testimony of a witness who has been discredited in an important particular the defendant is entitled to have his counsel argue to the jury all the evidence and facts which discredit the witness, and a limitation of his argument to thirty-five minutes is unreasonable.

3. SAME—*unreasonable limitation of argument is ground for a new trial.* Any limitation of the constitutional right to a fair trial which deprives a defendant of a fair opportunity to have his counsel argue the law and the facts constitutes error requiring a new trial.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOSEPH B. DAVID, Judge, presiding.

LEWIS HAUSCHILD, (THOMAS E. SWANSON, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (CLYDE C. FISHER, EDWARD E. WILSON, and HENRY T. CHACE, JR., of counsel,) for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

An indictment was returned to the criminal court of Cook county charging the plaintiff in error, Robert Mc-Mullen, and Edward Kurtz, Philip Harris, Edward Ryan and John Sullivan, with robbery of James Mahoney, being armed at the time with a revolver. The plaintiff in error and Ryan alone were put on trial in the criminal court. Kurtz had made a statement as to the robbery and that he took part in it, and he was given the privilege of a separate trial and testified for the People. There was a verdict of not guilty as to Ryan and a verdict of guilty as to the plaintiff in error, with the further finding that at the time of the robbery he was armed with a revolver.

On November 26, 1920, at about 7:30 in the evening, James Mahoney was entering an account in his books in his grocery at 5200 Wentworth avenue, in Chicago, when three men entered and drew revolvers and told him to hold up his hands and turn around, facing the shelving. He obeyed and stood with his back to the men while one of them took $15 from the cash register and another rifled his pockets, so that the robbers got $22 in all. Mahoney testified to these facts and said that he saw the plaintiff in error two days after the robbery at the detective bureau and told the detectives that he was the man that looked like the man who robbed him.

Edward Kurtz being called as a witness said that he had been allowed a separate trial and his bail reduced; that he did not know whether he was held for trial or not and

did not know when he would be tried, if at all and that he had made a statement about the facts at the detective bureau. He testified that about seven o'clock in the evening of November 26, 1920, he was in a saloon at Fifty-first street and Princeton avenue, in Chicago, with Robert McMullen, Edward Ryan, Philip Harris and a man named Sullivan; that Ryan and McMullen asked him if he would go on a hold-up with them; that they all went over to Michigan avenue and found a machine at Fiftieth street and drove around to two or three different saloons and went in with the intention of holding them up, but something would happen so that they would not go through with it; that they finally ended up in front of Mahoney's, and that Ryan, McMullen and Harris went across the street and waited until a couple of customers left the store and then went in and Sullivan and the witness waited out in the machine; that the three stayed in the store four or five minutes and then came out, and they drove the car back where they got it, and the fellow who loaned the machine drove them to Forty-first street and Princeton avenue; that Ryan said he got $22 out of Mahoney, and it was divided $4 each and $2 for drinks.

It appeared by the testimony of police officers that three policemen were in a saloon at 11:10 or 11:40 at Fifty-fourth place and Shields avenue in the evening of November 26, 1920, and another policeman was scouring the district outside; that the police were waiting for the police wagon, and McMullen and three or four other men were coming toward the saloon and were arrested, when McMullen threw away a revolver. The policemen searched McMullen and took some money out of his pocket which was not identified as being any part of the money taken from Mahoney.

McMullen and Ryan each testified that they had nothing to do with the robbery, and the defendant Ryan proved a perfect alibi by showing that he was at a dinner at his mother's at the time of the robbery. The mother had al-

ways had her children with her on Thanksgiving day, but on account of the fact that some of them had engagements, arrangement was made for the 26th. Kurtz was just as positive about Ryan as about McMullen and said that he was one of the party who proposed the robbery, but the jury gave no credit to his testimony concerning Ryan and were fully justified in regarding his testimony concerning Ryan as false. McMullen testified that he worked as a bartender for Fred Horner at Fifty-first street and Princeton avenue from five o'clock until about 11:15 in the evening of November 26. Frank Dohney testified that he saw McMullen tending bar at that place from 6:30 to about 9:30, and John J. Grant testified that he saw McMullen at the saloon tending bar continuously in the evening of November 26 until nine o'clock.

It is alleged that the plaintiff in error did not have a fair trial, free from any prejudicial influence, on account of the conduct of the trial judge and an unreasonable limitation of the time allowed to his counsel for argument to the jury. The identification by Mahoney not being very definite or emphatic and the testimony of Kurtz being completely discredited so far as Ryan was concerned, the case was one in which it was very important that the plaintiff in error should have a fair trial, with reasonable opportunity to his counsel to present his case to the jury. The defendants were represented by different counsel, Lewis Hauschild appearing for the plaintiff in error; McDonnell for Ryan. When a police officer from the detective bureau was testifying he said that the police officers arrested the two defendants on trial, in the saloon at Fifty-fourth place and Shields avenue. McDonnell then said to the court: "Just a minute, if the court please; just now I caught a high-ball signal to this witness," and charged that sergeant Cussack was coaching the witness and the defendants wanted a fair trial. The judge replied: "I want this stopped; I will pay no attention to it about high-balls or low-balls; I don't allow

this; I don't care who the lawyers are—whether defendants' counsel or plaintiff's counsel." McDonnell stated that the policeman, Cussack, shook his head at the witness when the witness stated that he arrested the two defendants in a saloon. The judge asked the jurors if they saw anything that sergeant Cussack did, and one juror answered that he did,—that he saw him shake his head. Another juror said that Cussack shook his head and made some speech that the juror did not understand, and that he was facing toward the witness when he shook his head. Cussack said that he might have shaken his head, and the judge said that simply because a man shakes his head does not justify the judge in saying that he was attempting to coach the witness, and he directed the sergeant to be careful how he shook his head. McDonnell said that he was not directing any remarks to the sergeant, but the sergeant was directing the witness, and he knew was trying to correct the witness. The judge said: "I want you to understand,—and you, too, Mr. McDonnell, or any other lawyer,—that I don't allow you to make these statements, and don't do it again." McDonnell was sworn and testified to the act of Cussack, and Cussack testified that he was telling the State's attorney that the witness was mistaken and they did not arrest both men at that time and place. The judge then said: "I won't allow back talk; I don't like lawyers to talk back to each other over the table; I don't allow it; I don't allow it in civil cases and I certainly won't allow it here; there is too much of that; I will send them all to jail if they do; I won't stand for it; I am running this court the same as I do the civil court; if lawyers have any objections to make they can make them."

It is clear that the judge was running the court, for there was constant interruption and interference with the examination of the witnesses. The judge frequently asked questions not necessary to determine upon any ruling, interposed objections where none were made by counsel, in

one case saying, "You don't have to answer that; he is not required to be a mind reader;" and when a witness testifying for the plaintiff in error referred to his arrest, the judge said, "How do you know when he was arrested?" The witness replied, "A party told me," and the judge said, "Oh! a party told you!"

This court has had occasion several times to consider the remarks and conduct of trial judges, and has said that a considerable latitude must be allowed in asking questions to enable the judge to give a proper ruling but has emphatically disapproved of anything which would tend to influence the jury in determining the facts. It has been said that a judge should exercise great care to avoid giving expression to any thought that would be calculated to lead the jury to infer that his opinion was in favor of or against the defendant in a criminal case. (*Featherstone* v. *People,* 194 Ill. 325; *Mash* v. *People,* 220 id. 86; *People* v. *Arnold,* 248 id. 169; *People* v. *Abrams,* 249 id. 619; *People* v. *LeMorte,* 289 id. 11.) There was no occasion for the remarks of the judge when counsel called attention to the act of Cussack, but after that occurrence the defendants were given an opportunity to withdraw a juror and they both declined. Inasmuch as the plaintiff in error did not avail himself of the offer by which he would have had another trial he ought not now be given another trial on account of what occurred. The constant interference of the judge in the course of the trial was improper, but whether it would be sufficient cause for reversing the judgment and awarding a new trial or not, the judgment must be reversed for another reason.

At the conclusion of the evidence counsel for plaintiff in error was limited to thirty-five minutes for argument to the jury. The evidence in the case covers 230 pages of the transcript of the record, and the question of guilt or innocence depended mainly upon the testimony of Kurtz. The indictment was for a felony, and it was charged that

the plaintiff in error was armed with a deadly weapon, so that he was liable to imprisonment for any term of years or for life. The testimony of Kurtz applied to both the defendants on trial and he was successfully contradicted as to one of them, so that on the question of his credibility counsel for plaintiff in error had a right to present to the jury all the evidence and facts which discredited him. Section 9 of the bill of rights secures to the accused in every criminal prosecution the right to appear and defend in person and by counsel, and this is not a mere empty and nominal right or an idle form. Plaintiff in error had a right to have his counsel given a reasonable opportunity to discuss before the jury both the facts and the law of the case, and the court could not legally deprive him of that right. Any limitation of the constitutional right which deprives a defendant of an opportunity to have his counsel argue the law and the facts has always been regarded as error requiring a new trial. (*Williams* v. *State,* 60 Ga. 367; *People* v. *Green,* 90 Cal. 564; *State* v. *Rogoway,* 45 Ore. 601; *Wingo* v. *State,* 62 Miss. 311; *Yeidell* v. *State,* 100 Ala. 26.) From the nature and importance of this case, the condition of the evidence and the time necessarily required to make a fair presentation to the jury, the limit imposed was unreasonable.

Complaint is made of an instruction concerning Kurtz, which was the same instruction given in *People* v. *Thompson,* 274 Ill. 214, concerning the witness Alfreda Nelson. It was not incorrect, at least when taken in connection with instruction No. 11 given at the instance of the defendants stating practically the same rule, with a statement that the testimony of the accomplice was subject to greater scrutiny than that of any other witness and that the jury should so weigh his testimony.

The judgment is reversed and the cause remanded.

*Reversed and remanded,*