UNITED STATES, Appellee

v.

JAMES R. SLOZES, Corporal, U. S. Army, Appellant

1 USCMA 47, 1 CMR 47

No. 12

Decided November 20, 1951

LT. COL. James C. Hamilton, USA, for Appellant.
MAJ. George B. Springston, USA, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

This case is before us on petition for review granted on August 30, 1951, pursuant to the provisions of the Uniform Code of Military Justice, Article 67(b) (3) (Act of 5 May 1950, 64 Stat. 108; 50 U.S.C. §§ 551–736). The accused, a corporal in the 622nd Military Police Company, stationed in Korea, was charged with rape in violation of Article of War 92 (§ 1, Chap. II, Act of 4 June 1920, 41 Stat. 787, as amended by acts of 20 August 1937, 50 Stat. 724; 14 December 1942, 56 Stat. 1050; 15 December 1942, 56 Stat. 1051; and 24 June 1948, P. L. 759, 80th Cong.). He was found guilty upon trial by general court-martial, held on May 6, 1951, of forcibly and against her will having carnal knowledge of a thirteen-year-old Korean girl, on or about February 10, 1951, at or near Osan, Korea. He was sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances to become due after the date of the order directing execution of the sentence, and to be confined at hard labor at such place as proper authority may direct for twenty years. The convening authority approved and a board of review in the Office of The Judge Advocate General, United States Army, has affirmed the conviction and sentence.

According to the uncontradicted testimony of government witnesses, the accused at the time alleged was posted at the north end of a bridge some five miles from Osan for the purpose of directing traffic. The victim, a Korean national, who lived near the bridge, passed the accused's post on the way to her home at approximately five o'clock in the afternoon. The accused pursued and overtook the thirteen-year-old girl, and after a struggle drew her beneath the bridge and laid her upon the ground. Thereafter he placed one hand upon her throat, separated her legs with one knee, and proceeded to effect the rape charged. The victim struggled unsuccessfully, kicking and pushing her attacker, and wept throughout the incident, which lasted from ten to twenty minutes. The girl's mother, on being informed of her daughter's predicament, approached the bridge where she saw her child overpowered by an assailant dressed in the uniform of an American Military Police soldier and otherwise unidentified by her. The soldier was observed to be holding his victim by means of one hand upon her throat, and on the mother's approach he threatened the latter with his gun, causing her to halt and secrete herself. After some twenty minutes the daughter crept from beneath the bridge and was carried to her home on her mother's back. While beneath the bridge the victim was observed by a further witness and was described as weeping, as being nude from the waist down, and as having

blood on her clothes. The victim appears to have been unknown to this Korean witness, who referred merely to having seen "a little girl" in the condition described above.

The accused was seen as he came from beneath the north end of the structure by his fellow Military Police bridge guard, Corporal Bowman, and admitted to the corporal that he had "had a girl under the bridge." Thereafter Corporal Bowman investigated to the extent of observing a girl thereunder nude from the waist down.

The prosecutrix was examined by a Navy medical officer a few hours after the alleged rape. In the location of the posterior fourchette of the introitus he found several small tears, not over three in number, surrounded by fresh hemorrhage. No treatment was deemed necessary by the physician, and no interpretation of his findings was solicited or furnished. He stated, however, that "when she saw my uniform she began to scream and cry."

The accused, after being advised of his rights, elected to remain silent, and no other evidence was offered in his behalf.

Two assignments of error were made in this Court by counsel for appellant. First it is urged that the court-martial erred in overruling the motion of the defense to strike the testimony of the prosecutrix, a child of tender years, on the ground of incompetency. Secondly it is suggested that, the prosecution witness being incompetent, the evidence before the court-martial was legally insufficient to sustain the findings of guilty.

In considering the first of these assignments, it is apparent that it will be necessary to measure the testimony of the prosecutrix by two yardsticks: (1) that of testimonial qualification as affected by infancy, and (2) that of the prophylactic rule embodied in the oath requirement. This is true, although the latter question was not argued on appeal, because the course is appropriate in the interest of completeness, and because the matter was raised by defense counsel at the trial.

At the time the victim was offered as a witness for the prosecution she was asked by trial counsel, through the official interpreter, "What is your religion?" She answered, "I have no religion." She was thereafter asked by the same officer, "You understand that in this case you are to tell the truth, the whole truth, adding nothing thereto and taking nothing therefrom?" She replied, "Yes, I do." At this point defense counsel objected on the ground that "it has not been established that she is a competent witness in that the witness understands the meaning of an oath or affirmation." The law member then interrogated the witness as follows, "Q How old is the witness? A 13 years old. Q Have you attended school? A No, sir. Q Do you know what it is to tell the truth? A Yes, I know." He then permitted the witness to be heard and she testified at length. It is to be noted that the prosecutrix had been "duly sworn," according to the record of trial, and the affirmation, more usual in situations of this nature, was apparently not administered. The record contains no further specific information concerning the witness' qualifications under the two principles adverted to in the preceding paragraph. Although the two problems are not entirely separate, her testimony will first be considered principally from the standpoint of the guaranty contemplated in the rule requiring an oath or affirmation.

Article of War 19 applicable to court-martial proceedings against the accused in this case provides as follows:

"All persons who give evidence before a court-martial shall be examined on oath or affirmation in the following form: 'You swear (or affirm) that the evidence you shall give in the case now in hearing shall be the truth, the whole truth, and nothing but the truth. So help you God.'"

Paragraph 103, Manual for Courts-Martial, 1949, likewise applicable to the hearing in this cause, contains the following language:

"In this paragraph the word

'oath' includes affirmation . . . In cases of affirmation the phrase 'So help you God' will be omitted."

Language from paragraph 124, Manual for Courts-Martial, 1949, the first portion of Chapter XXVIII, Rules of Evidence, is set out immediately below:

"So far as not otherwise prescribed in this manual, the rules of evidence generally recognized in the trial of criminal cases in the district courts of the United States, and, when not inconsistent with such rules, at common law will be applied by courts-martial."

Rule 26, Federal Rules of Criminal Procedure, provides in part as follows:

"The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

The employment of oaths finds its origin in early elements of Germanic law and custom, and it is familiar learning that until comparatively recent times oaths were required of all witnesses. Moreover only he could take an oath—and from this standpoint become qualified as a witness—who possessed a belief in a supernatural, and therefore, inescapable, punishment to follow false swearing. Ultimately in most jurisdictions it became permissible to substitute for the oath contemplated by the common law a simpler form of affirmation. It seems clear that this choice was provided to serve one or both of two purposes: (1) for use by proposed witnesses who possessed the necessary religious belief of the earlier law, but were forbidden the oath by conscientious scruples; or (2) with the gradual departure of the older view as to religious qualifications, for use by proposed witnesses who lacked the belief demanded at an earlier time. It is manifest that the military practice under which the accused was tried permitted the use of a simple affirmation in lieu of an oath, although we gain no

direct information from the Articles of War or the Manual for Courts-Martial in use at the time as to the reason therefor. Had the military practice dispensed with religious belief as an ingredient in witness qualification, or had it merely provided for affirmation in the case of believers with oath scruples?

Although the language of paragraph 124, Manual for Courts-Martial, 1949, is specifically confined to ■ "rules stated in this chapter," and although the Manual's treatment of the oath is not a part thereof, for the purposes of this case we accept, as applicable to the oath as well, the mandate of paragraph 124 applicable to other parts of the law of evidence. See also Article of War 38. We are thereby ■ remitted via Rule 26, Federal Rules of Criminal Procedure, for information concerning religious belief as an element of testimonial qualification in military courts, to "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

The District of Columbia Code (1940), Section 14–101, provides as follows:

"All evidence shall be given under oath according to the forms of the common law, except that where a witness has conscientious scruples against taking an oath, he may, in lieu thereof, solemnly, sincerely, and truly declare and affirm; and wherever herein any application, statement, or declaration is required to be supported or verified by an oath it is to be understood that such affirmation is the equivalent of an oath."

Standing alone, this language would seem to contemplate the use in the ordinary case of the common law oath with its cargo of religious content, and to permit relaxations only in the case of the scrupulous believer. However, something more than a year ago this legislative provision was the subject of consideration in Gillars v. United States, 182 F. 2d 962. Here it appeared that the witness, Schnell, objected to

as incompetent by the appellant, had stated that he did not believe in "the God of the Bible" nor did he believe in the notion of rewards and punishments after death. However, it did appear that he recognized the right, and even the duty, of society to force its members to speak the truth as witnesses. He had been permitted by the trial court to testify on affirmation. Holding that this did not constitute error, the court said at page 969:

"A fair reading together of the Code and the Rule leads to the conclusion that the common law rule in the District of Columbia is to be interpreted now in the light of reason and experience. This brings into the area of competence witnesses who were under disability under the older criteria."

In the Gillars case, of course, the witness was an unbelieving adult and was held to be a competent witness. In cases involving child witnesses, Federal courts—as well as those of the majority of states—have been particularly and properly anxious to avoid involvement with the element of religious belief in the common law oath concept, and this has been evident during a considerable period. In Williams v. United States, 3 App. D. C. 335, for example, the witness was a girl seven and one-half years of age. She did not understand the nature of an oath, nor did she know what was meant by being sworn in court, although she had attended Sunday School, believed that if she lied she would be whipped, and knew that it was wrong to tell an untruth. Nothing, in short, appeared in the case which indicated an understanding of the idea of God or a future state of rewards and punishment, save what may be remotely inferred from Sunday School attendance by one of her years. The court held her competent, having found that she understood the difference between right and wrong, was aware of the impropriety of false testimony, and that she had sufficient intelligence to appreciate the situation in which she was placed. In speaking of her qualifications the court said at page 341:

"A child that has an adequate sense of the impropriety of falsehood *does* understand the nature of an oath in the proper sense of the term, even though she may not know the meaning of the word oath, and may never have heard the word used." (italics supplied).

To the same general effect are Wheeler v. United States, 159 U. S. 523, 16 S. Ct. 93, 40 L. Ed. 244; Beausoliel v. United States, 71 App. D. C. 111, 107 F. 2d 292, and Posey v. United States (D. C. Mun. App.) 41 A. 2d 300. We are of the opinion, therefore, that no rule of law applicable to courts-martial required that the witness in this case meet a religious standard.

It is noted that despite the victim's assertion that she had no religion, she appears to have been sworn through use of the oath form provided in the Manual for Courts-Martial, 1949, terminating in an invocation of Deity. Despite the preferability of another course, we are not troubled by this doubtless unintentional departure from the more usual practice. A comparison of the language of questions and answers during her voir dire examination, appearing earlier in these pages, with the approved affirmatory language, set out in Article of War 19 as elaborated in the Manual, will disclose that in substance and effect she was given an affirmation before being permitted to testify. Moreover, in no other than a purely formal sense can we think that harm was done by substituting the word "swear" for "affirm" in the legend preceding her testimony, and by including the terminal invocation found in the Manual's oath prescription. Although strictly logical arguments to the contrary exist, we are inclined to believe that there is the body of an affirmation contained in every oath, and this is borne out by a study of the history of the situation and the development of the affirmation as a relaxation of the common law oath requirement. So long as modern cases regard the oath primarily as a solemn reminder to the witness of his special obligation to tell the truth—as they seem to do—we cannot think that the

witness was not reminded formally and sufficiently in this case. Moreover, it should not be forgotten that the burden is on the objector to show that the witness is incompetent under the prophylactic rule. See Wigmore, Evidence, 3d ed., section 1820, and cited cases. In this connection the learned author has said:

"In the first place, this inquiry [in ascertaining the capacity to take the oath] falls to the *party objecting,* *i.e.,* the burden is on the objector to show the witness' lack of the necessary belief. The examination of a *child,* however, is made usually by the *judge;* though either counsel has of course the right to supplement it by questions tending to bring out whatever may be in favor of his contention." (italics his)

In addition, the following language is quoted from the opinion of Mr. Justice Gantt, in the case of State v. Davis, 186 Mo. 533, 85 S. W. 354, 355, as the basis for an analogy in the present problem:

"The court held that the time to ask a witness whether the form of administering the oath is such as will be binding upon his conscience is previous to the administration of the oath. We think the criminal court was right. The objection, if any, was a preliminary matter; and when counsel was afterwards permitted, without objection, to inquire into the religion of the witness, and made no effort whatever to ascertain whether the witness regarded the oath he had taken as binding on his conscience, and neglected to do so before the witness was sworn, we cannot convict the trial court of error."

We conclude, therefore, that so far as the second branch of appellant's initial assignment is concerned, no error was committed by the court-martial in receiving the testimony of the prosecuting witness.

It is generally recognized that a clear distinction exists between the capacity to take an oath, on the one hand, and testimonial capacity, on the other. The oath, or its relaxed relative the affirmation, is, of course, a special test or security superadded and applied to persons assumed to be otherwise qualified as witnesses. Therefore, with the dispensation of the oath, or the substantial departure of its religious content, the latter element is forced into prominence, and the ques- tion has frequently arisen whether a sense of moral responsibility is not necessary as an ordinary testimonial qualification, especially likely to be found wanting in the case of the infant witness. Expressly or implicitly it is quite generally held that such a requirement exists—and this accords with our view of the necessities of the situation. See Wigmore, Evidence, section 495 and section 506. We will now proceed to consider the testimony of the prosecuting witness from this standpoint.

Although the earliest common law decisions passing on the question attempted to fix a minimum age below which children must be excluded as witnesses, it is today firmly established that in the absence of statute, there is no precise age which determines testimonial competency. That the true test of the competency of a child of tender years is intelligence, and not age, is the rule followed by all the modern authorities. As expressed in Wharton, Criminal Evidence, 11th ed., section 1180:

"The vital criterion or test of a child's competency is not age, but intelligence, or intelligence and a sense of duty to tell the truth; and the requirement is one of intelligence and understanding, not age, or age and religious belief."

And this is borne out specifically in the case of military tribunals by the following from page 175, Manual for Courts-Martial, 1949:

"The competency of children as witnesses is not dependent upon their age, but upon their apparent sense and their understanding of the moral importance of telling the truth."

**53**

Since the trial judge—the court-martial in a military case—is in a peculiar position to observe the infant's conduct, and to determine whether he possesses or lacks the requisite intelligence, it is equally well settled that it is the duty of the trial court to ascertain whether the infant is competent to be a witness, rather than that of an appellate tribunal with only the record of trial before it. Consequently the determination of this question in the court of first instance will not be disturbed on review unless it clearly appears that there has been an abuse of discretion or that action has been based on mistake of law.

The case of Wheeler v. United States, 159 U. S. 523, 524, 16 S. Ct. 93, 40 L. ed. 244, represents the prevailing view of the United States Supreme Court, and therein the principles mentioned above are laid down and approved. Here was involved a conviction of murder wherein an error assigned on appeal was that the trial court had improperly permitted the five and one-half year old son of the deceased to testify. Thus the question of the competency of a witness of very tender years was squarely before the Court, which, speaking through Mr. Justice Brewer, declared:

> "That the boy was not by reason of his youth, as a matter of law, absolutely disqualified as a witness, is clear. While no one would think of calling as a witness an infant only two or three years old, there is no precise age which determines the question of competency. *This depends on the capacity and intelligence of the child, his appreciation of the difference between truth and falsehood, as well as his duty to tell the former.*" (italics supplied).

A report of the questions propounded to the prosecuting witness on voir dire and her responses thereto is found earlier in these pages. In addition, she was heard by the court-martial to testify at considerable length. That the trial court's personal observation of a child witness, together with his substantive testimony—as well as his

pre-testimonial examination—may be resorted to in determining competency, and that they furnish a reliable guide thereto is also widely recognized.

In Anderson v. State, 199 Miss. 885, 25 So. 2d 474, 475, the court said:

> "This child was before the learned trial judge. He saw and observed her. He heard her words and noted her actions. He was in a much better position than is this court to say whether she was qualified as a witness."

And again in Oliver v. United States, 267 F. 544, 547, it is stated that:

> "In determining the competency, and intelligence of a witness, the court may and should take into consideration the general appearance and manner of the witness, as well as the statements made by him."

In addition, in People v. Karpovich, 288 Ill. 268, 123 N. E. 324, 325, the following language is used:

> "It is urged that the court erred in not making proper and sufficient examination of the complaining witness, Rose Rozhon, touching her intelligence and knowledge of the moral and legal consequences of a violation of her oath, before permitting her to testify.
>
> . . . . .
>
> "The requirement is not one of age but of understanding. Whether such child possessed the understanding necessary to be competent to testify may be determined on review, from the preliminary examination *and* (italics supplied) her testimony before the jury. Featherstone v. People, 194 Ill. 325, 62 N. E. 684. It appears from the record that Rose Rozhon was examined before the court touching her competency to testify by the state's attorney. It lay within the discretion of the trial court to permit her to testify, and from her answers *and* (italics supplied) her testimony in the case it is evident that there was no abuse of that discretion."

Finally, the following language used in this connection is found on page 175, Manual for Courts-Martial, 1949:

". . . Such sense and understanding may appear upon such preliminary questioning of the child as the court deems necessary or from the appearance of the child and testimony that he gives in the case. The court should make sure that any child witness under the age of 14 years understands *the difference between truth and falsehood,* and is aware of his *obligation to tell the truth.*" (italics supplied)

We have not failed to consider the questions of who should conduct the examination into the testimonial qualifications of the child witness, and who is to determine the method of conducting the inquiry. Although ▮▮▮▮ the determination of competency vel non ·rests with the trial court, it does not follow that the judge in civilian tribunals must be the sole agency to handle the interrogation. The record before us discloses that both the law member and trial counsel participated in the preliminary questioning of the witness here. This was not at all out of order. See Beausoliel v. United States, supra; Jackson v. Commonwealth, 301 Ky. 562, 192 S. W. 2d 480; State v. Orlando, 115 Conn. 672, 163 A. 256. Moreover, it has been held that the ▮▮▮▮ scheme or system of conducting the examination, as well as the extent thereof, are largely within the trial court's discretion. See Wharton, Criminal Law, section 1181, and State v. Orlando, supra. We think this is as it should be. Certainly no procedural strait jacket should be provided for an examination into the aptitude, capacity, understanding, or intelligence of a witness.

In support of his contention that the thirteen-year-old girl was an unacceptable witness, counsel ▮▮▮▮ for appellant has laid stress on her use of the word "violated" and other language, principally of a physiological nature, together with the lack of responsiveness of certain of her answers to questions seeking the meaning of these terms. There was, indeed, some suggestion. that this phenomenon reflected objectionable "coaching" of the witness.

As to this objection—doubtless founded to some extent on difficulties on the part of the interpreter—we believe that these shortcomings go to her credibility, or the weight of her testimony, rather than to its admissibility. These were simply matters for the triers of fact to consider in weighing the evidence. The court in Crenshaw v. State, 205 Ala. 256, ·87 So. 328, 329, in which a conviction of murder was reversed on other grounds, said in speaking of a similar situation:

"There is, of course, a wide distinction between the issue of competency vel non of a child of tender years to be a witness and inquiries relating to the weight and credibility of testimony given by such witness."

As to the suggestion made in the instant case that the prosecuting witness may have been "coached," the following observation is noted in State v. Meyer, 135 Iowa 507, 113 N. W. 322, 324, a case involving the alleged rape of a six-year-old girl:

"There may be some danger of the child being influenced by others to prevaricate, but such danger is fairly guarded against by the inability of one so inexperienced to keep up and sustain a false story throughout the various questions of a trial. To exclude their testimony would deprive them of the adequate protection of the law, for in cases wherein assault is charged conviction is ordinarily impossible without the aid of their evidence. We think that it may be safely received, and that the ruling of the trial court was correct."

We have concluded that no error was committed below in admitting the testimony of the prosecutrix, either because of difficulties connected with the cautionary requirement of the oath or affirmation, or relative to the necessity for an appreciation of the moral responsibility to speak the truth. This is not to say that we are entirely satisfied with the manner in which the matters of competency and qualification were dealt with below. Had counsel and court developed in greater detail the problem before them in these respects—as could easily have been ac-

complished—it is probable that the present appeal would have been unnecessary. It is hardly believed that the practice followed in this case on the point accords with the best usage in courts of the civilian community. We are convinced, however, that more than minimum standards were met and entertain no doubt as to the absence of error. Having so decided, it becomes unneccesary to consider in detail the second assigned error. Certainly, with the testimony of the prosecuting witness in the picture presented to the court-martial, it cannot be said that the findings are not supported by substantial evidence. It follows that the decision of the board of review must be affirmed.

Chief Judge QUINN and Judge LATIMER concur.